R. Shad Bennett and Anna Atkins Bennett, Husband and Wife v. Commissioner.
Bennett v. Commissioner
Docket No. 104524.
United States Tax Court
1942 Tax Ct. Memo LEXIS 114; 1 T.C.M. (CCH) 31; T.C.M. (RIA) 42576; October 28, 1942
*114 R. Shad Bennett, Esq., Big Bend & Grant Roads, St. Louis, Mo., and Gus O. Nations, Esq., for the petitioners. Carroll Walker, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, J.: The Commissioner determined deficiencies as follows: Year
Income Tax
Penalty
1936
$3,333.91
$166.70
1937
218.97
The issues raised by the pleadings are the correctness of the respondent's action in (1) disallowing a deduction of $500 taken for 1936 as a loss sustained from professional activities, (2) disallowing a deduction of $53.50 taken for 1936 as insurance on an automobile, (3) disallowing a deduction for 1936 of $10,000 taken as a loss sustained on a mortgage on property in Coral Gables, Florida, (4) disallowing a deduction for 1936 of $50 taken for contributions, (5) including in income for 1936 the amount of $3,094.92 as rents, (6) increasing by $874.13 the amount of capital gains reported for 1936, (7) increasing by $795 the amount of dividends reported for 1936 and by $1,160 the amount of dividends reported for 1937, (8) including in income for each of the years 1936 and 1937 the amount of $2,400 as representing living quarters and meals furnished *115 petitioners by a sanatorium by which Mrs. Bennett was employed, (9) disallowing $1,021.63 of the deductions taken for each of the years 1936 and 1937 for depreciation on real estate, (10) failing to allow as a deduction for 1937 the amount of $4,200 as a loss sustained on property in West Palm Beach, Florida on account of which the petitioners took and the respondent disallowed a deduction of $4,000 for 1936, (11) failing to determine that the petitioners are entitled to a refund of the tax paid for 1937 because of loss on investments, (12) determining that the petitioners are liable for a 5 per cent penalty for negligence for 1936, and (13) disallowing $101.60 of the deduction taken for 1937 for repairs on rental property. Issue No. 13 was abandoned by petitioners at the hearing. For convenience, the discussion of each issue will follow immediately after the findings of fact relating thereto and the various issues will be considered in the order previously noted. At the outset, however, and as applying to all the issues, we make the following general findings of fact. General Findings of Fact The petitioners are husband and wife and filed joint income tax returns for 1936 and 1937. *116 Their books were kept and their returns were filed on the cash receipts and disbursements basis. Issue I. - Deductions Claimed in Connection with Maintenance of Law Office Findings of Fact Bennett is a member of the Missouri Bar and during the years 1936 and 1937 did some legal work. His activities during those years included the investing in stocks, bonds, securities and real estate, financing and engaging in building operations and some dealings in oil lands. He maintained an office in the Telephone Building, in St. Louis, Missouri, subrenting office space from a lawyer by the name of Charles P. Noell. Bennett's only income from the practice of law in 1936 was $400 for work done by him for Noell, the entire amount of which was applied by Noell on the office rent payable to him by Bennett. In addition to the $400 so applied to rent and which is not in issue, Bennett paid $496 as office rent. Among other 1936 expenditures connected with the maintenance of his office were $202.50 for stenographic services, $27 as dues to the Lawyers Association of St. Louis, $25 as dues to the Law Library Association, and $10 for office supplies. Most of such law practice as Bennett had consisted *117 of cases handled on a contingent fee basis. In the handling of such cases, he advanced or supplied the funds to cover costs and similar or related expenses in connection therewith. During 1936 he expended $277.85, described by him as court costs and cost of investigations made in connection with suits for clients. He disbursed $380 described by him as having been paid for assistance from other lawyers also in suits for clients. Thirteen dollars was advanced as costs in a suit involving the wife of a close friend, which suit was handled by another lawyer. No attempt was ever made to recover or collect the $13 so advanced. On a trip made by Bennett into Illinois in 1936, in connection with his law business, his automobile was wrecked. In connection with the collection of the insurance on the automobile and the sale of the wreckage, Bennett expended $5 for photographs of the automobile and $1 for a certificate of ownership. In the operation of his automobile for business, he expended $10 for gasoline. In 1936 Bennett expended $8.26 for copies of court records in connection with tax lien foreclosure proceedings involving Florida property on which he held a mortgage. Also during 1936 *118 he paid an attorney's fee of $50 in connection with steps taken to recover another parcel of Florida property owned by him and on which a tax lien had been foreclosed. In addition to the expenditures previously mentioned, Bennett in 1936 expended $20 for a cabinet of some sort and made disbursements, covered by 18 checks, totaling $703.35, which disbursements are claimed by him to have been for traveling and other expenses in conjunction with his business. Opinion The general tenor of the petitioners' contention seems to be that all of the expenditures or disbursements enumerated in the findings of fact above were related to Bennett's law practice. That such should be the case is in our opinion most unlikely. His entire gross from his law business during the year was only $400 and did not amount to 50 per cent of his office rent. We think it more likely that more of Bennett's time was devoted to other activities than to law. Certainly judging from results they were more productive of income. Treating the real estate and related operations as the conduct of a business along with such law work as was performed, and after considering the oral testimony and studying the cancelled checks, *119 check stubs and all other evidence of record which in our opinion might have any bearing on the items here involved, we have concluded that the items of office rent, $496, stenographic services, $202.50, dues to Lawyers Association, $27, dues to Law Library Association, $25, office supplies, $10, and the $10 expended for gasoline are properly attributable to Bennett's business operations and should be allowed as deductions. The remaining items are disallowed. With respect to the items disallowed, Bennett's testimony was at times confusing and vague and entirely unconvincing, and in many instances in direct conflict with the written evidence. Court costs, costs of transcripts and other direct expenses of litigation are normally the costs of the clients and are not ordinary and necessary expenses of the lawyer. Bennett made no effort to show whether or not he had been reimbursed in some subsequent year for such expenditures, taking the position that they were his expenditures and should be allowed as deductions regardless of any subsequent recovery or repayment. Considering the nature of the expenditures and the state of the record, we find no justifiable basis for classifying the *120 said disbursements as ordinary and necessary expenses in the conduct of his law business. Certain of the items disallowed are claimed by Bennett to have been amounts paid to lawyers for assistance in suits for clients. In a law business which grossed only $400 during the year, we think it hardly likely that Bennett would pay out $380 for the assistance of other lawyers. According to his testimony, most of his cases were taken on a contingent fee basis, but few, if any, of them resulted in the collection of any fees during the taxable years and we are given no information as to when the said cases were closed or whether Bennett received from the proceeds a return of such amounts as may have been paid to other lawyers. According to Bennett, $250 was paid by check to Earl M. Pirkey for assistance in preparing an appeal in one of his cases. The check stub, presumably written at the same time the check was drawn, indicates that the amount was expended for printing the character of which was not shown. We listened to Bennett for several hours and consideriing the impression made and the state of the record, we think it much more likely that any lawyer giving assistance to him in a case *121 taken on a contingent fee basis would be required to await the outcome of the suit for any compensation that might be due him. Disbursements totaling $703.35 and covered by 18 checks are claimed by Bennett to have been for traveling and other expenses in the conduct of his business. Four of the checks, totaling $50, were issued to Bennett's mother. Some of the checks were drawn payable to cash and endorsed by Gus Kallimanis. The stub for one such check indicates that it was drawn for "Pool," while on another stub the notation was "Ill." The stubs of other checks indicate that they may have been related to certain real estate lots. The proof of record does not justify the allowance of any such items as ordinary and necessary expenses in the conduct of Bennett's business. The expenditures in connection with Bennett's wrecked automobile might have had some bearing on the determination of whether or not a deductible loss was sustained by him from the wrecking of the automobile. They are not deductible, however, as ordinary and necessary expenses. Similarly the items expended in connection with Florida real estate are not ordinary and necessary expenses. Neither is there any basis for *122 holding that the $13 advanced as costs in a suit involving the wife of a close friend, which suit was handled by another lawyer, constituted an ordinary and necessary expense. Issue II. - Automobile Insurance Findings of Fact During 1936 Bennett paid $83 for insurance on an automobile used by him in his various activities. In determining the deficiency the respondent disallowed a deduction of $53.50 taken in 1936 for automobile insurance. Opinion The petitioners contend that they are entitled to a deduction of $83 for automobile insurance. However, in their petition they made claim for a deduction of only $53.50. The proof shows that the automobile was used chiefly but not wholly for business. Such being the state of the pleadings and proof the deduction for automobile insurance is allowed to the extent of $53.50. Issue III. - Loss on Mortgage on Property in Coral Gables, Florida Findings of Fact In 1927 Bennett loaned Coral Gables Corporation, a Florida corporation, $10,000. For the loan he received the corporation's promissory note for that amount, dated March 22, 1927, and payable on or before five years after date with interest at the rate of 8 per cent per annum, *123 payable quarterly. To secure the payment of the note the corporation gave him a first mortgage on four lots situated in Coral Gables, Dade County, Florida. The corporation continued the payment of interest on the note for about two years when due to bankruptcy or the imminence thereof it transferred title to the lots to another corporation which continued the payment of interest until 1931 or 1932. Thereafter the interest payments were discontinued. Due to the insolvency of Coral Gables Corporation Bennett did not institute foreclosure proceedings. Arthur McBride, of Cincinnati, had acquired certain tax sale certificates on the lots in the approximate amount of $3,000 for some undisclosed years. In August 1936 McBride brought a suit in the Circuit Court of the Eleventh Judicial Circuit of Florida, in and for Dade County, for the purpose of foreclosing on the tax sale certificates. He named Bennett as one of the defendants. After investigating the possibility of redemption Bennett concluded that it would be "uneconomic" for him to do so. In the fall of 1936 and in consideration of a payment to him of $100 by McBride, Bennett entered his appearance in the suit and delivered the note *124 and mortgage to McBride's attorney in order to expedite the proceeding and to save himself any cost in connection therewith. On December 30, 1936, the court entered its final decree which provided in part as follows: 10. That unless there be paid forthwith and immediately unto the plaintiff or the attorney of record for the plaintiff, or the Clerk of this Court, the amount necessary to redeem each lot upon which the plaintiff, Arthur McBride, has a lien as found in this decree, the said lot not redeemed by the payment of the said amount as aforesaid shall be sold by STUART W. PATTON, who is hereby designated and appointed as Special Master of this Court, to execute and carry into effect this decree; that the said Master shall sell said property under and by virtue of this decree at public outcry to the highest and best bidder for cash at the South Front Door of the County Court House, in the City of Miami, Dade County, Florida, on a legal sales day of this Court, and during the legal hours of sale, first giving public notice of said sale by publishing said notice in the Miami Review and Daily Record, * * *, once a week for four (4) consecutive weeks, the first publication to be *125 not less than twenty-eight (28) days prior to the date of sale, to satisfy this decree; * * * 11. That the said Master at the said sale shall render unto this Court his report of said sale * * *. 12. That upon effecting the sale of said property in the manner and form herein prescribed, and upon the Master's Report of said sale being confirmed by this Court, the said Master shall execute and deliver to the purchaser or purchasers his Master's Deed conveying to said purchaser or purchasers the property purchased at said sale. 13. That upon the sale being made in the manner aforesaid, the defendants * * * R. Shad Bennett, * * * and each of them, and all persons claiming under, by or through them since the filing of the Lis Pendens in this cause, be forever foreclosed and barred of any and all right of equity or redemption, or claim what-soever in and to the property as sold under this decree. On February 6, 1937, the special master filed his report of sale with the court and on March 24, 1936, the court entered its order confirming the sale. Aside from the $100 heretofore mentioned Bennett never received anything further in connection with the note and mortgage. On their income *126 tax return for 1936 the petitioners took a deduction of $10,000 as a loss on the note and mortgage on the Coral Gables property. The respondent disallowed the deduction. Opinion The petitioners contend that in view of Bennett's surrender of the note and mortgage on the Coral Gables property to the attorney for McBride in the fall of 1936, under the circumstances presented, they are entitled to a deduction of $10,000 in 1936 as a loss on the note and mortgage. The respondent contends that since the sale of the property could not have occurred under the court's decree until after the expiration of twenty-eight days from December 30, 1936, and that during that time Bennett had a right to redeem the property, any loss sustained by Bennett was sustained in 1937. Apparently the parties have proceeded upon the erroneous theory that the deduction, if any, allowable to the petitioners with respect to the note and mortgage is allowable under the loss provisions of the statute rather than the bad debt provisions. Under facts such as we have here the deduction, if allowable at all, is allowable under the bad debt provisions of the statute which provide for the deduction of debts in the year *127 in which they are ascertained to be worthless and charged off. The note here involved was executed by Coral Gables Corporation under date of March 22, 1927, and became due five years later. The maker continued payment of the interest thereon for about two years when either because of bankruptcy or threatened bankruptcy it transferred the lots to another corporation which continued the interest payments until about 1931 or 1932 after which time no further interest payments were made. Bennett did not foreclose the mortgage upon the lots for the reason as stated by him, that Coral Gables Corporation was insolvent. He fails to explain why the insolvency of that corporation deterred him from proceeding to foreclose and realize whatever amount, if any, that would be available from the sale of the lots. It may well be that his reason for not doing so was that they were worth less than the expense that would have been involved in foreclosure proceedings. Nor does he show what attempts, if any, he made between 1932 and 1936 to collect the amount of the note. The mortgage securing the note contained a provision that the mortgager would pay all taxes and assessments on the lots and that if it *128 did not do so promptly the mortgagee might at any time pay the same without waiving or affecting any right he had thereunder and that every payment so made should bear interest from the date thereof at the rate of 8 per cent per annum. Bennett offers no explanation as to why, since the mortgagor did not pay the taxes, he did not pay them himself, as he was authorized to do under the mortgage instead of letting the taxes go unpaid and losing his rights under the mortgage as a result thereof. It may be that the lots were not worth the taxes owing on them and that the issuance of tax sale certificates on them in prior years wiped out all value of the notes. Cf. ; affd., . Bennett not only does not claim but denies that he sold the note and mortgage in 1936 for $100. On the evidence presented we are unable to find that the indebtedness did not become worthless, and that Bennett did not ascertain it to be so in some year prior to 1936. The respondent is sustained on this issue. Issue IV. - Contributions Findings of Fact During 1936 Mrs. Bennett contributed $25 to the Methodist *129 Church. In their return for that year the petitioners deducted $50 for contributions. The respondent disallowed the deduction. Opinion The petitioners are entitled to a deduction of $25 for contributions. Issue V. - Rents Findings of Fact In 1933 the Acer Realty Company, a corporation, was engaged in the construction of a certain building and in connection therewith employed the services of George Bartling, an architect, to whom it agreed to pay an amount equal to 7 per cent of the construction costs as his compensation. Beginning May 1, 1933, Bartling occupied a house owned by Bennett and located at 4549 Westminster Place in St. Louis. Petitioners also advanced to Bartling certain sums of money against his prospective earnings under the contract of employment with Acer Realty Company. Having received said advances and not having paid any rent on the house occupied by him Bartling on March 3, 1934, entered into an agreement with Acer Realty Company and the petitioners whereby he assigned to petitioners all sums which then were due or which might thereafter become due to him as compensation under his contract with Acer Realty Company. Said sums were to be in payment of all *130 advances theretofore made to him by petitioners and for rent on the house occupied by him. It was expected that the building would be completed about June 1935 but it was not completed until July or August of that year. On November 1, 1935, the cost of the building was ascertained and the amount of Bartling's compensation was definitely determined at $3,094.92. Bartling left the house at 4549 Westminster Place at that time. The $3,094.92 was not actually paid to petitioners by Acer Realty Company until 1938. However, at the time the amount was determined in 1935, Acer Realty Company was in need of all the money it could get for building purposes and there was an oral agreement between Bennett and the officers of the corporation that the amount would be left with the corporation as a loan. In closing the books of the corporation as of January 31, 1936, an entry was made by the corporation's auditor crediting the petitioners with $3,094.92, with the explanation "To allow 7% of Building [new] costs to November 1st, 1935, as an architectural fee. These fees were assigned to Anna M. & R. S. Bennett. This amount is less $765.00 previously allowed". In their income tax return for 1935 the *131 petitioners reported as income the amount of $3,764.17 as rent received on 4549 Westminster Place stating that $3,084.00 of the rent on Westminster property is for a past period". In determining the deficiency for 1936 the respondent determined that the $3,094.92 represented rental income for 1936 and increased the income of petitioners by that amount. Opinion The petitioners take the position that the rental of $3,094.92 was income to them in 1935, and was reported as such in their return for that year. The respondent contends that the rental did not become available to the petitioners until it was credited to them on the books of the corporation in 1936 and that it then became taxable income. The facts show that the money did become payable in 1935 but by oral agreement between Bennett and the corporation was left with the corporation as a loan. The mere fact that the book entry reflecting the loan was not made until a subsequent year does not change the situation. On reply brief the respondent concedes that the petitioners' 1935 return shows that the rent on the Westminster Place was reported as income in that year. Furthermore, the 1935 return and the papers attached indicate *132 that it was examined by respondent's agent and found to be correct. This action on the part of respondent's agent tends to corroborate the conclusion we have reached as to the facts. The petitioners are sustained on this issue. Issue VI. - Capital Gains Findings of Fact The following is a statement of capital assets sold by petitioners during 1936, the dates such assets were acquired, the dates sold, amounts realized, cost, gain, years held and percentage and amount of gain to be taken into account in computing net income: Date
Date
Amount
Acquired
Sold
Realized
Cost
100 shares
Anaconda
Copper
Jan. , 1934
Oct. 20, 1936
$4,528.40
100 shares
Anaconda
Copper
Apr. 7, 1936
Apr. 17, 1936
3,840.92
$3,715.00
100 shares
Auburn
Auto
Nov. 8, 1935
Jan. 10, 1936
4,325.91
3,965.00
100 shares
Auburn
Auto
Jan. 29, 1936
Feb. 11, 1936
4,775.90
4,165.00
100 shares
Freeport
Texas Co.
Dec. 13, 1935
Jan. 9, 1936
2,830.44
2,765.00
100 shares
Mack
Truck
1934
Oct. 20, 1936
4,663.40
100 shares
Midland
Steel
Jan. , 1934
Apr. 2, 1936
4,275.91
100 shares
National
Power &
Light
Mar. 17, 1936
Apr. 17, 1936
1,105.47
1,025.00
100 share
U.S. In-
dustrial
Alcohol
Feb. 19, 1936
Apr. 6, 1936
5,698.38
4,090.00
100 shares
U.S. In-
dustrial
Alcohol
Jan. 24, 1936
Mar. 13, 1936
5,235.89
4,227.50
100 shares
U.S. In-
dustrial
Alcohol
Mar. 17, 1936
Apr. 6, 1936
5,823.38
5,117.50
100 shares
Vanadium
Corp
Jan. 6, 1936
Jan. 9, 1936
2,203.45
2,200.00
200 shares
Stone &
Webster
1933
Nov. 4, 1936
3,910.92
2,275.00
10 M Bonds
Utility
Power &
Light Co
1933
Jan. 8, 1936
6,355.31
5,120.00
Total
*133 Gain to be taken
into account in
computing
net income
Per
Years
cent-
Gain
Held
age
Amount
100 shares
Anaconda
Copper
$ 825.00
2-5
60
$ 495.00
100 shares
Anaconda
Copper
125.92
0-1
100
125.92
100 shares
Auburn
Auto
360.91
0-1
100
360.91
100 shares
Auburn
Auto
610.90
0-1
100
610.90
100 shares
Freeport
Texas Co.
65.44
0-1
100
65.44
100 shares
Mack Truck
1,648.40
2-5
60
989.04
100 shares
Midland
Steel
2,013.41
2-5
60
1,208.05
100 shares
National
Power &
Light
80.47
0-1
100
80.47
100 shares
U.S. In-
dustrial
Alcohol
1,608.38
0-1
100
1,608.38
100 shares
U.S. In-
dustrial
Alcohol
1,008.39
0-1
100
1,008.39
100 shares
U.S. In-
dustrial
Alcohol
705.88
0-1
100
705.88
100 shares
Vanadium
Corp.
3.45
0-1
100
3.45
200 shares Stone &
Webster
1,635.92
2-5
60
981.55
10 M Bonds
Utility Power &
Light Co.
1,235.31
2-5
60
741.19
$8,984.57
In computing net income on their return for 1936 the petitioners took into account capital gains in the amount of $10,006.06. The respondent increased the amount by $874.13 or to a total of $10,880.19. Opinion Relying on the testimony of Bennett *134 that according to his computation the total amount of capital gains to be taken into account in computing net income is $7,441.11 the petitioners contend that we should find that only such amount is to be taken into account. Bennett did not give in detail his method of computation nor do the petitioners on brief explain how such amount was computed. The respondent contends that the evidence shows that the correct amount of capital gains to be taken into account in computing net income is $8,985.11. From a consideration of all of the evidence submitted on this issue we have found as a fact that the correct amount is $8,984.57 computed as shown in our findings of fact. Respecting the cost of the 200 shares of Stone & Webster stock sold in 1936 Bennett's testimony was to the effect that this stock was purchased in 1933 for $3,000. In support of his testimony petitioners submitted a broker's statement of the account of Mrs. Bennett for the month of May 1933 showing the purchase on May 29 of 200 shares of Stone & Webster stock at a cost of $3,000. The statement further shows the sale on May 31 of 200 shares of Stone & Webster stock for $2,859. Since the statement fails to show that any *135 Stone & Webster stock was carried in the account at the beginning or at the close of the month and that there was any other transaction in the stock during the month except the foregoing purchase and sale it is obvious that the broker's statement does not corroborate but tends to contradict Bennett's testimony. The respondent having determined that the cost of the stock sold in 1936 was $2,275 and the evidence failing to show that it was otherwise, we have used that amount in the computation of the gain thereon. Bennett's testimony was to the effect that a gain of $1,708.38 was realized on the 100 shares of U.S. Industrial Alcohol bought on February 19, 1936, and sold on April 6, 1936. According to the cost and the selling price as shown by the purchase and sales slips, respectively, relating to the transactions as well as by the broker's statement the gain was only $1,608.38, the amount shown in our findings of fact. Issue VII. - Dividends Findings of Fact During 1936 and 1937 Bennett maintained an account with Newhard, Cook & Company, stockbrokers, in St. Louis. During these years dividends in the indicated amounts were paid on the following stocks held by the brokers in *136 the account and were credited by the brokers to Bennett: Year
100 shares U.S. Industrial Alcohol
$ 75
200 shares Celanese
300
100 shares Mack Truck
50
Total $425
Year
200 shares Celanese $450
100 shares Bohn Aluminum
275
100 shares Midland Steel
150
Total $875
The foregoing dividends of $875 for 1937 were not reported as income by the petitioner because the transactions in the account showed a loss for the year. During 1936 Mrs. Bennett received directly from the corporations dividends in the indicated amounts on the following stock: 100 shares Celanese $150
100 shares Mack Truck
150
100 shares Calumet-Hecla Copper
25
Total $325 Dividends received in 1937 by Mrs. Bennett directly from the paying corporations amounted to $375. The foregoing constitute all the dividends received by the petitioners during the respective years. In determining the deficiencies for 1936 and 1937, the respondent increased the gross income of the petitioners by $795 and $1,160, respectively, on the ground that dividends in said amounts had not been reported by the petitioners. Opinion The petitioners contend that they reported in their 1936 and 1937 returns all *137 the dividends received in those years and that the respondent's action in increasing their income for said years in the amounts of $795 and $1,160 should be reversed. The petitioners' returns for said years are not in evidence and we are unable to determine what amounts were reported as income from dividends for such years. However, their incomes for such years are to include dividends only in the amounts set out in our findings of fact for the respective years. The fact that the transactions in the account with the brokers showed a loss for 1937 provides no basis for the elimination from taxable income of the dividends reflected in the account. Issue VIII. - Living Quarters and Meals Findings of Fact During 1936 and 1937 Mrs. Bennett was employed as matron and housekeeper by the Glenwood Sanatorium, an institution for the treatment of mental disorders. In conjunction with her employment and for the proper performance of her duties she was required by the institution to reside in living quarters furnished by it in the building which housed patients. During these years the petitioners occupied such quarters rent-free, often eating Thursday lunch and Sunday dinner at the sanatorium. *138 With the exception of the foregoing meals the petitioners personally provided their own food, giving to the sanatorium all excess food purchased by them for their personal use. The conditions under which they lived and the quarters occupied were not of such character and quality as to be any inducement to the petitioner for living at the sanatorium in the absence of the requirements of Mrs. Bennett's employment. The respondent determined that the quarters and meals furnished petitioners by the sanatorium had a value of $2,400 a year and increased the income of petitioners by such amount for each of the years 1936 and 1937. Opinion Where an employee, for the convenience of his employer and as a necessary and essential incident to the proper performance of his duties, receives living quarters and meals from the employer, the value thereof does not constitute taxable income to the employee. Accordingly we hold for the petitioners on this issue. Issue IX. - Depreciation Findings of Fact In 1926 Bennett acquired the premises known as 4549 Westminster Place in St. Louis at a cost of $15,000. The premises consisted of a lot 50 feet wide fronting on the north side of Westminster *139 and running back to a depth of about 150 feet to an alley; and an old residence of brick and stone construction containing fourteen rooms and three baths with the interior in fairly good condition. Bennett acquired in 1927 at a cost of $10,000 the premises known as 4329 Delmar Boulevard in St. Louis. This property consisted of a lot 50 feet wide fronting on the north side of the Boulevard and running back some undisclosed depth to an alley; and an old brick residence containing fourteen rooms. In 1928 Bennett acquired the property known as 6200 McPherson Avenue in St. Louis at a cost of about $25,300. The property consisted of an irregular shaped lot about 180 feet wide at the front and about 40 feet wide at the rear and approximately 200 feet deep; an ornate cut stone residence, erected about 1910 to 1912 and containing seventeen rooms and three baths; and a three car garage with three rooms and bath above. After acquiring the property Bennett expended $16,000 on it for improvements and occupied it as his residence until 1934 when he moved out and it became rental property. In their income tax returns for each of the years 1936 and 1937 the petitioners took a deduction of $1,600 *140 for depreciation on the three properties. For each of the years the respondent allowed $578.37 of the deduction taken and disallowed the balance of $1,031.63. Opinion On brief the petitioners take the position that they are entitled to a deduction in each of the years 1936 and 1937 of $2,130 for depreciation. The respondent contends that the evidence on the issue does not warrant the allowance of any greater amounts than he has allowed. While the petitioners submitted evidence respecting the fair market value on the crucial dates of the land contained in the various lots and also as to the date of the construction of the residence at 6200 McPherson Avenue they failed to submit any evidence as to the probable useful lives of the structures at the time of acquisition by petitioners or as in the case of the buildings at 6200 McPherson the probable useful life at the time they ceased to be used by petitioners for a residence and were devoted to rental purposes. In the absence of such evidence we are unable to determine the rate or rates of depreciation applicable and consequently the amounts of depreciation the petitioners were entitled to thereon. Under these circumstances we cannot *141 say that the respondent erred. The respondents' determination on this issue is sustained for lack of proof. Issue X. - Loss on West Palm Beach Property Findings of Fact On January 18, 1925, E. B. Donnell acquired from hubert F. and Meta L. Krantz an unimproved lot in Prospect Park, West Palm Beach, Florida. On the same day Mrs. Bennett (then Mrs. Anna M. Atkins) loaned Donnell $4,200 receiving therefor 2 notes for $2,100, each dated January 18, 1925, payable in one and two years after date with interest at 8 per cent per annum payable semi-annually, signed by Donnell and his wife and secured by a mortgage on the lot Donnell had acquired that day from Kranz and his wife. On March 25, 1925, Donnell sold the lot, subject to the foregoing mortgage, to Margaret M. Cashatt who on September 25, 1925, sold it, also subject to the mortgage to William F. Stieff. No part of the principal of the Donnell notes was paid and by 1927 the payment of interest was in default. Various persons had tried to collect money from Donnell but were unable to do so because he was judgment-proof. Nothing was obtainable from his wife on the notes. Accordingly the petitioners instituted a foreclosure proceeding *142 against Stieff who was the owner of the lot. The proceeding was dismissed under an agreement whereby the petitioners in order to avoid litigation, exchanged the notes for the lot. On February 28, 1927, Stieff executed a deed to petitioners for the lot which specifically recited, among other things, that the lot was being transferred subject to any and all unpaid taxes and municipal assessments against it subsequent to 1924. On December 31, 1930, Juanita T. Mounts was the legal owner and holder of tax sale certificates (1) for state and county taxes on the lot for the years 1925 and 1932, the tax sale certificates for said taxes having been issued on July 7, 1930, and August 7, 1933, respectively, and (2) for taxes levied by the city of West Palm Beach for the years 1931 through 1935, tax sale certificates for such taxes having been issued during the years 1932 through 1936, respectively. In addition she had paid state and county taxes on the lot for the years 1931 and 1933 through 1936. On the basis of such tax sale certificates and payments totaling $688.74, she instituted, on December 31, 1936, a foreclosure proceeding against petitioners in the Circuit Court of the Fifteenth Judicial *143 Circuit of the State of Florida, in and for Palm Beach County. After service on petitioners by publication on January 1, 8, 15 and 22, 1937, decree pro confesso was entered against them on February 4, 1937. On February 8, 1937, final decree was entered allowing the petitioners one day from that day to pay the amount found therein to be owing by them on the tax sale certificates and tax payments and in default of payment, ordering the sale of the lot and appointing a special master to conduct the sale. The lot was sold on March 1, 1937, to Juanita T. Mounts and on the same day a decree was entered confirming the sale. On March 4, 1937, the special master executed to the purchaser a deed for the lot. The petitioners were thereby divested of ownership of the lot and neither of them received anything with respect to it. In their income tax return for 1936 the petitioners took a deduction of $4,000 as a loss on the West Palm Beach lot. The respondent disallowed the deduction. Opinion In the section of their petition relating to 1936 the petitioners assigned as error the respondent's disallowance of the claimed loss on the West Palm Beach lot. In their allegations of fact they made *144 the following statement with respect to said assignment of error: The deduction for the loss of property in West Palm Beach, Florida by its foreclosure, was erroneously taken in the sum of $4,000.00 for the year 1936 and should actually be credited to petitioners for the year 1937, and is actually in the sum of $4,200.00. In the section of their petition relating to 1937 the petitioners assigned as error the respondent's "erroneously failing to credit petitioners with the loss of Palm Beach property, which was charged by petitioners to the 1936 returns but which actually became a legal loss in 1937." In their allegations of fact they made the following statement respecting the foregoing assignment of error: The loss of $4,000.00 claimed in 1936 by petitioners for the loss of property in West Palm Beach, Florida, is conceded by petitioners to have been erroneously credited for the year 1936 and which should have been credited by petitioners to the year of 1937, in the sum of $4,200.00, the facts being that petitioners foreclosed a mortgage on said property on or about the year 1928 in the sum of $4,200.00 and accepted said property for the mortgage foreclosure; that they kept the *145 property thereafter until the year 1936, when a tax foreclosure proceeding was begun against said property, the final decree of which was not entered until the year 1937. The petitioners erroneously credited themselves with such loss in the year 1936 and with the lesser sum of $4,000.00 instead of $4,200.00 as a result of an error in memory of the amount, they having failed to refer to records prior to crediting themselves with the loss for the year 1936. In his answer the respondent denied the assignments of error and allegations of fact respecting the loss. At the hearing Bennett made the opening statement for the petitioners and took the position that the loss was $4,200 but was sustained in 1936. He stated that he would ask for the privilege of filing an amended petition to conform to the proof if after the trial of the case, he deemed it essential but no request has been made to amend with respect to the matter. In his opening statement counsel for respondent observed the conflicting positions taken by petitioners in their petition and in their opening statement as to the year in which the claimed loss was sustained and took the position that under the pleadings that petitioners *146 would not be entitled to the loss in 1936 if it were not allowed to them in 1937. On brief the petitioners urge that the loss was sustained in 1936. In view of the statements made in their petition and since no amendment was made thereto we think the pleadings do not present any issue respecting the allowance of the loss in 1936. If the pleadings did present such an issue the evidence fails to disclose any facts to indicate that the petitioners were deprived of their title to the lot in that year. Nor is there any showing that in 1936 there was an abandonment as was the case in . However, in view of the following disposition we make of the issue it becomes immaterial whether there was a loss of the lot in 1936 or in 1937. The cost basis of the notes exchanged in 1927 for the lot was $4,200. To the extent that the fair market value of the lot at that time was in excess of, or less than, $4,200 taxable gain, or deductible loss, was realized upon the exchange. In either case the fair market value of the lot at the time of its receipt constituted the petitioners' basis for ascertaining gain *147 or loss on its subsequent disposition. ; American Cigar Co., 21 B.T.A.; affd., ; certiorari denied, ; . The only evidence bearing on the fair market value of the lot at the time the petitioners acquired it is that of Bennett. He stated that he thought the lot was worth the amount of the notes; that he did not think it was a bad deal to take the lot for the notes; that on the basis of the amount of the notes as the cost of the lot the lot possibly could have been sold at the time for a profit "except you couldn't get all cash." In contrast to these favorable statements as to value he stated that the reason suit was not brought on the notes was that various other persons had attempted to collect money from Donnell and had failed to do so; that he was judgment-proof; that nothing was collectible from Mrs. Donnell on the notes and that the notes were exchanged for the lot to avoid litigation. From the foregoing the implication is clear that the *148 petitioners took the lot because they could not collect the $4,200 either from the Donnells or from the owner of the lot or from the sale of the lot under foreclosure proceedings and that the exchange of the notes for the lot was the least expensive method of obtaining all that was available from the notes. In taking the lot they took it subject to unpaid state and county taxes thereon for as early as 1925 and partly on account of the non-payment of which the property was lost to petitioners. Under these circumstances we cannot hold that $4,200 was the fair market value of the lot at the time petitioners acquired it. The evidence shows that for the purposes of assessing state and county taxes the lot was valued at $480 in 1925 and at $320 in 1932. The evidence indicates that the petitioners paid the taxes on it for the years 1926 through 1930 in some undisclosed amounts. No explanation is offered as to the failure of petitioners to pay taxes for 1925 at or during the time they paid the taxes for 1926 through 1930. We are unable to find from the evidence that the lot had any value at the time it was acquired in excess of the taxes outstanding against it. The burden of proof to establish *149 a deductible loss and the amount of it rested on the petitioners. . In this they have failed and the respondent's action in disallowing the loss deduction claimed is sustained. Issue XI. - 1937 Loss in Securities Account Opinion After each party had closed his case at the time of the hearing in this proceeding, petitioners sought to amend their pleadings so as to show that a loss of at least $14,000 had been sustained by Bennett in his purchase and sale of securities in 1937, whereas a deduction of only $2,000 had been claimed on the return. It was claimed that under such an issue raised in an amended petition the proof would show that the petitioners had no net income for 1937 and would therefore be entitled to a determination of an overpayment for that year equal to the total tax paid. Under the theory that the amendment as explained would raise a new issue after the case had been closed, and was therefore untimely, the petitioners' motion was denied. On brief the petitioners contend that the issue is in fact raised by their petition, wherein the following appears: "Petitioners further claim an adjustment for *150 the taxes paid for the year 1937, due to the fact that the same were erroneously paid and that said sum should in equity be repaid petitioners." It is argued that under that allegation the evidence of record shows that a loss was sustained during 1937 on the purchase and sale of securities in the total amount of $14,161.60 and that the petitioners are entitled to a deduction of the full amount of said loss. We think it clear that the allegation referred to does not raise the issue argued; but assuming that it does, petitioners are not entitled, on the evidence of record, to the deduction claimed. A statement of the account for the year was put in evidence and is relied on by petitioners in support of their contention. The statement shows that during the year Bennett sold eight blocks of corporate stock. As to one block of the stock consisting of 100 shares of Celanese which was deposited with the broker on October 15, 1937, and sold on October 21, 1937, for $1,880.46 the evidence fails to show when the stock was acquired by Bennett and at what price. Therefore we are unable to determine the amount of the gain or loss on this stock or the percentage thereof that is to be taken into *151 account in computing net income as provided by the capital gain provisions of section 117 of the Revenue Act of 1936. Three of the blocks, all of which had been held for not more than one year, were sold at a gain, the total gain being $802.33 and 100 per cent of which was to be taken into account in computing net income. The remaining four blocks were sold at a loss, the total loss being $7,407.98. All of the four blocks had been held for not more than one year except one block. This block had been hedf for more than one year but not more than two years and only 80 per cent of the loss thereon was to be taken into account in computing net income. By reason of this the total loss to be taken into account in computing net income was reduced to $6,834.17. Reducing that amount by $802.33, the amount realized on stocks on which there was a gain, leaves $6,031.84 as the net capital loss sustained on the account. By reason of the limitation contained in subdivision (d) of section 117 the loss was allowable only to the extent of $2,000. The 1937 return of the petitioners is not in evidence but according to the statement of petitioners' counsel that amount was taken as a deduction on the *152 return. The petitioners' claims on this point are not supported by the evidence. Issue XII. - Negligence Penalty Opinion The respondent has determined that petitioners are liable for the 5 per cent negligence penalty imposed by section 293 of the Revenue Act of 1936. The grounds for making such an addition to the tax was stated in the deficiency notice, as follows: It is held that the failure to keep proper and sufficient records in regard to income and expenditures, and other items included on your return; the claiming of a deduction for a loss on a mortgage without reporting the income derived, and the failure to report various items pertaining to income and deductions in the correct amounts constituted negligence or intentional disregard of rules and regulations. Accordingly, an addition of 5 per cent of the deficiency is made pursuant to provisions of section 293 of the Revenue Act of 1936. From the evidence it appears that petitioner R. Shad Bennett kept no books and records which would properly reflect his transactions entered into for profit or the results of any business conducted by him and that in making his income tax return he made no serious effort to assemble *153 or organize facts and data essential to the making of a proper return. Corroboration of our conclusions in that connection is indicated by the obvious lack of preparation for the hearing before this Court and the confused manner in which the evidence was offered. The respondent's determination of the 5 per cent addition to the tax for negligence is sustained. Decision will be entered under Rule 50.